## Pascuzzi v. Jones & Laughlin Steel Corporation

*James B. Ceris*, for plaintiff.
*Reed, Ewing & Ray*, for defendant.

MCCREARY, P. J., January 13, 1956.—The above action in trespass was instituted against defendant, Jones & Laughlin Steel Corporation, for recovery of damages caused to plaintiffs' home in Baden, resulting from an explosion which occurred on August 10, 1948, at the slag dock at the Aliquippa Works Division of said corporation at Aliquippa, Beaver County. Plaintiffs' case was tried on the theory that said explosion occurred as the result of the negligence of defendant corporation, by its workmen and employes, in negligently dumping and permitting molten slag to run down and into a pocket of water which had accumulated in a low spot in the pit of said slag dock, where slag was regularly dumped in connection with the operation of its steel business. On the basis of the entire testimony presented, the jury found that defendant corporation, by its workmen and employes, was in fact negligent and thereupon returned a verdict in favor of plaintiffs for damages in the sum of $1,932.

Following the conclusion of the trial and the rendition of the aforesaid verdict, counsel for defendant filed a motion for judgment n. o. v. and a motion for a new trial, the reasons assigned in support thereof being as follows:

"1. The verdict was contrary to law.

"2. The verdict was against the weight of the evidence.

"3. The verdict was contrary to law and against the weight of the evidence."

Within 30 days after the record was transcribed defendant assigned additional reasons in support of both motions in language as follows:

"I. The defendant moves for judgment n. o. v. on the grounds that the plaintiff's case is based on an allegation of negligence on the part of the defendant and it is not such negligence that the plaintiff is excused from proving her case to the jury by the fair weight and preponderance of the evidence.

"II. The Court erred in admitting the testimony relating to negligence of the following witnesses: (a) Paul G. Henry, (b) E. H. Houck.

"III. The Court erred in permitting to be read into evidence a portion of an inter-office memorandum of the defendant, identified at the time of trial and copied into the record, although not marked as an exhibit.

"IV. If the testimony and evidence enumerated in Paragraphs II and III hereof had not been submitted to the jury over the objection of the defendant, there would have been no evidence on which the jury could have found negligence on the part of the defendant.

"V. The verdict in the amount of $1,932.97 was excessive."

*Motion for Judgment n. o. v.*

The verdict of the jury was not contrary to law, nor was it against the weight of the evidence. It is well supported by the testimony of the witnesses, both in the matter of the jury's finding of negligence and in the amount of the verdict. As a matter of fact, the amount of the verdict was well within the limits of the amount of damages testified to by the witnesses for the respective parties. No one testified on behalf of defendant as to the cause of the explosion.

Such being the state of the record, we cannot con-

sider, on a motion for judgment n. o. v., the alleged error on the part of the court in admitting the testimony of Paul G. Henry and E. H. Houck. In considering a motion for judgment n. o. v. the court may not eliminate evidence on the ground of its inadmissibility and then enter judgment n. o. v. on the diminished record: Cherry et al. v. Mitosky et al., 353 Pa. 401; Henry Schenk Company v. Erie, 352 Pa. 481; Donegal Township School District v. Crosby, 171 Pa. Superior Ct. 372. In the present state of the record the court cannot, under the law, enter judgment n. o. v. for defendant.

### Motion for a New Trial

We come then to consider whether any of the reasons assigned in support of the motion for new trial have any merit. Certainly the allegation that the verdict was contrary to law or against the weight of the evidence finds no support in the record, nor is there any basis for the charge that the verdict was excessive. The amount of the verdict was exclusively a jury matter, and it cannot be said that the amount of the verdict for property damages, namely, $1,932.97, was excessive. The record of the testimony would have supported a much higher verdict. The only assignment of error that deserves discussion is the one which alleges that the court erred in admitting the testimony relating to negligence recited by Paul G. Henry, lower level foreman in the open hearth department of defendant company, on duty at the time of the explosion, the particular operation involved in the explosion being under his supervision, and the testimony of E. H. Houck, the superintendent of safety and welfare at the Jones & Laughlin Steel Corporation Aliquippa Works, whose duty it was to make a thorough investigation of the cause of the explosion and who did make such investigation the next day and report the same to his superiors.

In the first place, the testimony of Agostino Trombetta, the craneman at the slag dump where the explosion occurred on the early morning of August 10, 1948, in itself is sufficient basis for a finding of negligence which was the proximate cause of the explosion. In testifying as to the cause of the explosion, he said, pages 13-15:

"A. That's dirt ground, yes, not concrete or—it is ground, yes.

"Q. Ground?

"A. Yes.

"Q. That floor, on that night, was it level?

"A. No level.

"Q. Well, you tell the Jury, in your own way, about that floor, a hundred by fifty?

"A. It was a hole; some place level; you got bucket over there, load cars standing over here, standing over there.

"Q. This night you worked did you have an explosion—did an explosion take place while you were working there, August 10th, 1948?

"A. That was explosion what?

"Q. Did you have an explosion there that night?

"A. That night?

"Q. Yes.

"A. Yes.

"Q. How long after you came on your duty at midnight did the explosion take place?

"A. Well, I don't know exactly; I didn't have no watch—maybe one, two o'clock—I don't know.

"Q. I see. Now, this particular bucket that caused the explosion, did it have molten steel and cinders and slag in it?

"A. Well, I don't know, maybe have steel inside too moist.

"Q. Moist?

"A. Maybe.

"Q. Did you upset the bucket?

"A. Box, yes.

"Q. The box. Did you take it off the buggy with the crane?

"A. Yes.

"Q. Where did you haul it to with the chains, with the crane—where did you take it?

"A. I take it on the middle of the pit.

"Q. In the middle of the pit?

"A. Yes.

"Q. When you got in the middle of the pit—

"A. The man go over there take on chain off front and put on the back, upset the box.

"Q. Yes?

"A. The box got hot cinder, roll over, catch water.

"Q. It hit water?

"A. Yes; have explosion.

"Q. Did an explosion take place then?

"A. Yes.

"Q. When you upset the box, did the contents, the slag and everything—

"A. Yes.

"Q. —Did they run like water?

"A. Yes.

"Q. The hot, molten steel?

"A. Yes; like water, yes.

"Q. Just like water—and you say it hit a puddle of water?

"A. Yes.

"Q. And the explosion took place?

"A. Yes.

"Q. Now, you say you were on that job four or five years, doing that work?

"A. Yes.

"Q. Under the safety regulations of your job, and

that slag pit was it a violation of the slag rules and regulations, the safety rules and regulations, to have any water in the pit?

"A. I don't know about that. Rain, you can't stop it.

"Q. Was it a violation of the safety rules to dump slag in water?

"A. No.

"Q. How?

"A. No.

"Q. What do you mean?

"A. You can't dump slag in water.

"Q. Not allowed?

"A. No."

On the question of scienter this witness testified as follows, pages 20-22:

"Q. I am going to ask you again, Mr. Trombetta—don't talk about 1946—

"A. Yes.

"Q. —but in the two years before this explosion did you ever have any explosion like this explosion on August 10th, 1948?

"A. No.

"Q. O.K. Now, can you explain to this Jury why this explosion on August 10th, 1948, took place? What made it explode?

"A. The water.

"Q. I know; but—

"A. The water—I upset box, and cinders is hot, roll over catch the water.

"Q. Now, was that box allowed to cool off long enough before you upset it?

"A. I don't know about that. The man told me to dump, and I have to dump.

"Q. But on your job there, doing this same kind of work over and over and over again,—

"A. Yes.

"Q. —in four or five years,—

"A. Yes.

"Q. —tell this Jury now, was this slag left to cool off long enough before they ordered you to dump it?

"Mr. Reed. Objected to, unless he knows when the slag was poured in the box.

"A. The slag was a little bit hot.

"The Court. There is an objection; and the objection is sustained, unless he knows how long it was allowed to cool. Exception.

"Mr. Ceris. Yes; I'll ask him that.

"Q. Mr. Trombetta, in these four or five years you have been doing this job, you know how long slag is supposed to be cooled off, and how long it was cooled off before that night?

"A. No, I don't know anything about that—I don't 'fostay'—I don't know.

"Q. When you dumped this bucket of slag,—

"A. Yes.

"Q. —was it hotter than the other slag you always dumped?

"A. Well, some boxes little bit hot, some a little bit cool off; you know, not all the same kind.

"The Court: That doesn't answer the question.

"Mr. Ceris. No.

"The Court. You are talking about this box.

"Q. This box—was this box—

"A. This box was hot, yes.

"Q. This box was hot?

"A. Yes.

"Q. Was this box cooled off as much as the average box you used to dump before?

"A. If box cool off it don't make explosion."

We conclude that if the admission of the testimony of Paul G. Henry and E. H. Houck was error, it was at worst harmles error. But we are satisfied that their testimony was admissible.

116

With reference to the particular testimony of E. H. Houck, who was permitted by the court to refer to and testify from an interoffice memorandum for the purpose of refreshing his recollection as to the cause of the explosion, we are satisfied that not only his testimony, but the report itself could have been admitted in toto under the Uniform Business Records as Evidence Act. As is readily admitted in defendant's brief, said act was intended by the legislature to extend the old "Shop Book" common law rule. In the past, under the common law rule, a business record was admissible only by and through the person who prepared the record and who had personal knowledge of the facts therein recorded. This rule, at the time of its existence, was a practical one when private enterprise in our country was, generally speaking, confined primarily to small businesses, in which more often one man was readily familiar by his firsthand knowledge with whatever transpired in the business. However, the prevailing "one-man business" of former times is now greatly in the minority and, on the contrary, in the present day and age, large corporations have sprung up and now constitute the great part of the economic life of our time. Industrial corporations, in the category of defendant corporation and others of lesser size, operate on a large scale with extensive operations which, of necessity, involve the employment of numerous persons to effectively carry on its business, as well as numerous persons in management for the tabulating and recording and the preparation of reports concerning its vast and complicated activities and the integral factors related thereto. In the care of such corporations, it would be impractical and a human impossibility for any one man to have personal knowledge of all that might transpire within the business structure and activities. Such large corporate businesses are operated by staffs of competent men,

working under various departmental heads. To carry on such an extensive enterprise it must be through the medium and coördinated effort of many employes. It goes without saying that the final and summary reports of said corporation, as to any particular phase of operations or as to the whole, require a compilation of many interdepartmental reports from the ground level to top management. These involve the intermediate and coördinated activities of numerous persons who supply certain essential portions of information which taken as a whole reflect all the facts as they appear in a final analysis and summary report or reports, the same being recorded or filed as the permanent records of the corporation. It is in this present day industrial setting, that the courts must view this particular case and the particular testimony involved when passing upon the admissibility of the contested evidence under the Uniform Business Records as Evidence Act. The Aliquippa Works of defendant company covers five miles of land and employs 12,000 persons.

The Act of May 4, 1939, P. L. 42, sec. 2, 28 PS §91b, provides:

"A record of an act, *condition* or *event* shall, in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission." (Italics supplied.)

The report of Mr. E. H. Houck fulfills all the requirements therein set forth.

1. It is clearly a record of a "condition or event". The uncontradicted testimony of E. H. Houck establishes that he was, at the time of said explosion, the

superintendent of welfare and safety for the entire Aliquippa Works Division of defendant corporation, and for the better and efficient performance of his said duties was assisted by other men in his particular department, with the right to him to receive the co-operation and assistance of other departmental heads in a general overall company safety program and policy; that when the explosion involved in this case occurred, said superintendent of welfare and safety immediately directed that an investigation be made of the incident to ascertain all the pertinent facts as bearing upon the cause or causes thereof, with a view to avoiding such catastrophies in the future; that a thorough investigation of said matters was started the next day by E. H. Houck and other employes of defendant company; that at a meeting attended by said superintendent of welfare and safety and other employes constituting a board of investigators within approximately 24 hours after said explosion, each contributed his individual report of the phase of the investigation within his respective knowledge upon which a final report was compiled and formulated. Said report was taken in writing in longhand by the witness, E. H. Houck, who immediately thereafter caused the same to be reduced to a typewritten report intended to be a permanent record of defendant corporation. Said final report dealt in summary form with all the facts uncovered and compiled by said investigation and the same is a summary of all such facts and circumstances and a conclusion derived therefrom as to the cause of said explosion.

2. E. H. Houck was a qualified witness to testify with respect to said report, for, as his uncontradicted testimony shows, he not only prepared the report personally, reducing the facts uncovered by his investigation to longhand, but also maintained custody over said report.

3. As discussed, supra, E. H. Houck did in fact testify as to the identity and mode of preparation of said report.

4. The report was made in the regular course of defendant's business. E. H. Houck was authorized, in fact it was his duty, as superintendent of welfare and safety, to prepare the report in question as part of the regular course of business, and he transmitted the same to Mr. Martin, the general manager of defendant's Aliquippa Works.

5. The report was made at or near the time of the event. As Mr. Houck himself testified, the report was concluded within 24 hours of the commencement of the investigation, the investigation having commenced at 8 a.m. on August 11, 1948.

6. The sources of information, method and time of preparation were such as to justify its admission. As to the sources of information, the report was prepared after discussion with and interrogation of all the employes involved. There can be no question therefore but that the report is based on the best source of information possible.

As to the method of preparation of the report, Mr. Houck, as above stated, first investigated the accident, discussed it with and interrogated all the employes directly involved, before reducing the discovered facts and his conclusions to a written report.

Furthermore, there are several other factors that show the admissibility of this report. The report, having been compiled for the guidance of defendant corporation in avoiding future occurrences of like nature, and said report having been prepared by Mr. Houck in the proper performance of the duties of his employment, and the contents of the report being detrimental to defendant, there could not have been any reason for falsifying the report, or any portion thereof. In addition, this report was not prepared

by Mr. Houck with the sole purpose in mind of keeping a personal memorandum of the facts surrounding the explosion, but the report was prepared for the edification of the employers of Mr. Houck and, as a matter of fact, was subsequently forwarded through channels to those in higher positions of authority within the corporation.

The record shows that the following colloquy was had at the trial, pages 90-92, 178:

"The Court. We will rule on this other matter later.

"Q. When you got to the slag pit the next morning what time was it?

"A. That I don't recall.

"Q. Well, how long after this meeting would you say it was?

"A. That I don't recall. It would have—

"Q. What is your best judgment?

"A. I wouldn't care to state. After that long time, I don't know.

"Q. Well, do you have an independent recollection as to who was there when you got to the pit?

"A. No, sir.

"Q. Is there anything you can recall about this slag pit when you got there?

"A. The particular aspect of the slag dump, no, sir.

"Q. Well, then, this report having been made back in 1948, the one thing that you are certain of is the fact of what is written in the report, of course?

"A. That's right.

"Q. The other matters which may have led to the writing of this report, you say you cannot now recall them?

"A. That's right.

"Q. So, you would be required, then, to depend entirely upon this report in order to assist this Jury to see the picture as it then occurred; is that right?

"A. That's correct.

"Q. Then, as part of your duties would it not be quite likely, and, as a matter of fact, almost a certainty, that in connection with your position, and for the proper investigation of this matter, that you would make an extensive examination of the slag pit to see the result of the explosion—is that not likely?

"A. That's right.

"Q. Do you recall anything that would tell us as to the result of the explosion—do you remember seeing anything as to indicate the results of the explosion that you were investigating, with reference to the terrain and the immediate buildings, and the crane, and whatnot, at the south slag dump?

"A. Nothing that I can recall now.

"Mr. Ceris. Now, that being the case, Your Honor, we ask that the Court require—oh, in order to pass upon the objection, we might say, as a counter objection to the objection, that under the explanation of the witness this report is the thing that must govern, in the absence of a witness's independent recollection; he having none.

"By the Court:

"Q. Is this report to Mr. H. F. Martin, made by you, a part of the records of the Jones & Laughlin Steel Corporation?

"A. They are.

"Q. And is it under your care, that is, this copy, at least—Mr. Martin would get one, I presume, the original?

"A. That is correct.

"Q. Now, do you make an investigation of this type for the purpose of determining the cause, so that, as a matter of safety, a similar occurrence may be prevented, or the possibility of it happening minimized?

"A. That is correct.

"Q. And what you say in this report to Mr. Martin —by the way, who is Mr. Martin?

"A. Mr. Martin, since deceased, was at that time Work Manager.

"Q. The job that Mr. Devaney now has?

"A. That is correct.

"Q. You have no reason, at the time, to falsify anything that you have in your report—did you—or, would you?

"A. I would positively not.

"Q. This report is for the guidance of the safety department of Jones & Laughlin Steel Corporation?

"A. And the operating department.

"The Court: It comes very close to being admissible under the Uniform Business Records Act, like a hospital record, and so on, provided the person that keeps the record, or makes the report, is in Court to testify to it. If you keep a record in the regular course of your business, and for a definite purpose, like a doctor has to in order to properly diagnose and treat a case, the record is admissible in evidence. The witness on the stand has no personal recollection of the minor phases of the investigation, or even the major phases at the time and place, and what was done, now, because it is six years ago; and I can understand why he would not have; but he says that what he reported to the head of the company at that time, or head of that mill, was accurate. I think it is admissible, and so rule; and the objection is overruled; exception.". . .

"The Court. The Court is of the opinion that it is admissible, such a record, because we believe that the sources of information, and the matter of time of preparation were such as to justify its admission under the Uniform Business Reports Law. There is no motive at all for falsification; it is a diagnosis of a situation with the idea in view of minimizng the possibility of its happening again in the future. It is all made by employees of the Jones & Laughlin Steel Corporation; it is a record of their company transmitted

to the head man of their company, as part of their business records; and it is prepared by the man himself who is the head of the safety department, and transmitted as truth to the head man of the mill. We, therefore, overrule the objection, and Mr. Houck will be required to answer; and we will have it copied into the record by the Court Stenographer, so that when defense counsel takes exception to it, it will be a part of the record which can be reviewed. if necessary. We want it all in the record, although that whole thing doesn't go into the record here, just the parts concerning which questions have been asked the Court—and there is one paragraph there in particular. Exception."

Were the rule otherwise, it is quite evident that plaintiffs would be faced with an almost impossible task of establishing causation and negligence on the part of defendant corporation. Defendant, a large corporation, and the owner of the property upon which the explosion occurred, possessed this unique knowledge as to the cause of the explosion, such knowledge not being available to plaintiffs in any other manner than that exercised by them in presenting their cause to the jury. For this reason the admission of this report, above and beyond the reasons cited above, proves to be a fair and just method of providing plaintiffs with evidence in support of their claim, such method not being prejudicial in any manner to the rights of defendant.

Therefore, since the report qualifies as a business record within the provisions of the 1939 statute, there is no question but that it could be used to refresh the maker's recollection, even without the report being introduced into evidence: Perry v. Ryback, 302 Pa. 559, 568.

Counsel for defendant has cited and relies heavily upon the very recent case of Haas v. Kasnot, 371 Pa. 580, in an attempt to sustain his position of inadmissi-

bility. The court recognizes that the facts in that case vary greatly from the facts in the present case. In that case, the report involved was prepared by someone other than the witness who used the report to refresh his recollection. This is not true in the instant case. In that case, the report was compiled by several individuals, none of whom had witnessed the occurrence in question, and several of whom could not be identified. None of these factors are present in this litigation. For these reasons alone the Haas case is not applicable to support defendant's contention of the inadmissibility of this report.

Even if Mr. Houck's report had not come within the provisions of the 1939 statute, it still would be usable for the purpose of refreshing his memory as to the contents thereof.

It was clearly stated in the case of Sabin v. Michaelsen, 72 Pa. Superior Ct. 226, that the rules applicable to the admissibility of documentary evidence as a business record do not apply where the record is used merely to refresh recollection, where the court said, p. 229:

"If the effort be to prove the record of a prior recollection, it is important that the record shall have been made when the memory was fresh and the events so recent as to assure probable accuracy, but where the object is merely to restore to the mind of the witness the recollection of facts of which he once had knowledge, a memorandum made at a later time, or a copy of a former memorandum; may be used if the witness have knowledge of its accuracy. It is not essential that the paper be an original document, nor is it necessary to account for the original, the important matter is that it is calculated to restore the recollection of the witness. In *Mead v. White*, 6 Sadler 38, a copy of an account which the witness had taken from pocket mem-

oranda which he had carried until they were worn out, was used by the witness to refresh his memory. Of such use of the copy, the Supreme Court says: 'It may be conceded that the written memoranda were not admissible as entries made in the course of business in a book of original entries, yet it is well settled that the witness may use a paper containing a list of items to refresh his memory, when he knows the entry to have been correct when he made it'."

In the instant case, the witness whose recollection was being refreshed was the superintendent who had prepared the report in question after investigation and interrogation of the employes; the report contains a record of the facts as he found them to be and his conclusions and recommendations with respect thereto.

It further appears in the uncontradicted testimony, that he had no independent recollection of the facts and circumstances surrounding the explosion and that, without reference to the report, he would have been unable to testify to those matters which were contained in said report and which he verified to be accurate and true as of the time he had prepared it. There is no question, therefore, that he properly used the same to refresh his memory.

In the case of Edwards v. Gimbel, 202 Pa. 30, an insurance company investigator noted down the result of his investigation, had it typewritten, signed it and sent it on to the insurance company. It was held, in an action for the accident thus investigated, that the typewritten report was usable for the purpose of refreshing his memory. The court said, p. 38:

"Immediately after his conversation with Humphries, Garrett, an investigator for the Guarantor's Insurance Company, made a memorandum of it. The next day he had the memorandum copied by a typewriter and signed the copy, and sent it as a report to his

superior officer. It therefore appears that while the conversation was fresh in his memory and his recollection of it was distinct, Garrett recognized the typewritten copy of his memorandum as an accurate transcript of it and a correct statement of the conversation."

So, also, in the instant case, the superintendent could have his memory refreshed as to what his investigation of the accident revealed and what his recommendations and conclusions were.

It should be kept in mind that in construing the propriety of the method of refreshing a witness' recollection the courts have been liberal, even to the extent of holding that the witness' recollection can be refreshed by a report prepared by a third party (Com. v. Roth, 71 Pa. Superior Ct. 71), or by a mere summary prepared from daily notes (Lardieri v. Lamont, 172 Pa. Superior Ct. 35). Certainly if such liberality is permitted, there is no question but that Mr. Houck's report (a report which he was not only authorized to prepare but which it was his duty to prepare in the regular course of business), being a record of a condition or event prepared at or near the time of the event, and made from his own investigation and from his personal interrogation of the employes directly involved, could be used for the purpose of refreshing his recollection of what his investigation revealed and his conclusions and recommendations with respect thereto. The only use made of this record compiled by Mr. Houck was to ask him what his investigation revealed. He answered no more that what Agostino Trombetta, the only eye witness, had already testified to. His complete report is attached to the record, but was not offered in evidence or permitted to go out with the jury.

In the matter of the testimony of Paul G. Henry, plaintiffs concede that his testimony relating to the

cause of the explosion was purely hearsay. This was not developed clearly, however, until the cross-examination of Mr. Henry by counsel for defendant. Following said cross-examination, defendant's attorney remained silent and thus failed to seek the relief available to him at that time. The proper action of counsel for defendant was to interpose an objection to said testimony, a motion to strike said testimony from the record and a motion to the court to instruct the jury to disregard that portion of the testimony of Mr. Henry which was so clearly hearsay evidence. It is the refusal of said motions by the court which would be assignable as error. These motions not having been made, said questionable evidence cannot now be stricken out on a motion for a new trial: Burger v. Paul, 6 Schuyl. Reg. 298. This hearsay testimony of Mr. Henry, standing in the record in its present status and being relevant to the issue of causation, can now be given the value of direct evidence by the court: Broad Street Trust Company v. Heyl Brothers, et al. 128 Pa. Superior Ct. 65. Counsel is not permitted to waive his immediate remedy in the hope of gaining a new trial in the future based on the presence of inadmissible testimony on the record. This would only result in burdening the already overburdened court with a further hearing in a matter which had already been tried by the court, and in a prejudicial delay of the termination of the action commenced by plaintiffs. Mr. Henry only testified to the things testified to by Trombetta, and if his testimony was inadmissible, it was harmless error.

It is conceded that plaintiffs are required to prove their case by the fair weight and preponderance of the evidence as is contended by defendant's counsel in his brief to the court. As discussed in Waldron v. Metropolitan Life Insurance Company, 347 Pa. 257, this

means simply that the evidence of circumstances on which plaintiff relies and the inferences logically deducible therefrom must be so preponderable in favor of the basic proposition which he is seeking to establish as to exclude any equally well supported belief in any inconsistent proposition. The testimony on the part of Mr. Trombetta, the craneman, alone, is clear and concise and puts the matter of causation and negligence far beyond guess, conjecture or speculation by the jury. It will be seen that his testimony preponderates in favor of the basic and sole proposition advanced by plaintiff's that hot slag rolled into a pool of water and caused an explosion, it being clearly known to the employes of defendant that such an explosion was likely to occur, and had occurred on numerous other occasions under the same circumstances. Defendant at no time during the trial attempted to offer any explanation contrary to this proposition advanced by plaintiffs as to the cause of the explosion and the negligence of defendant therein. Consequently, this is the only proposition as to causation and negligence which was before the jury for its consideration, and the jury, by its verdict, established this proposition to be a fact. A new trial should be refused.

Entertaining these views, we make the following

### Order

Now January 13, 1956, the motion of defendant for judgment n. o. v. in its favor is overruled, and it is ordered, adjudged and decreed that judgment be entered on the verdict upon payment of the jury fee.

### Order

Now January 13, 1956, it is ordered, adjudged and decreed that defendant's motion for a new trial be overruled and a new trial be and the same hereby is refused.